UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

**JAN 0 6 2005**

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| CELIA JOHNSON, Individually and on Behalf of all Others Similarly Situated, | § § § | |
| Plaintiffs | § § | |
| V. | § § § | CIVIL ACTION NO. H-03-3641 |
| TGF PRECISION HAIRCUTTERS, INC., BRELIAN, INC. and FRANK TAVAKOLI, | § § § | |
| Defendants | § § | |

## MOTION TO DECERTIFY CLASS

Defendants, Brelian, Inc. (Brelian), TGF Precision Haircutters, Inc. (TGF) and Frank

Tavakoli (Tavakoli)  file this motion to decertify the conditionally certified class as follows:

### SUMMARY

The notices have been sent, the notice period has expired, the returned consent forms

have been filed (the Brelian employees and ex-employees who filed the consent forms are

referred to herein as the "opt-ins"), and Defendants have responded to Plaintiffs' voluminous

production requests. The conditionally certified class should now be decertified because (1)

there is no merit to the claims of the named plaintiff of FLSA violations regarding her

employment, (2) many of the opt-ins are not eligible, (3) the eligible opt-ins are not similarly

situated, (4) the great majority of the eligible opt-ins are commission-paid hair stylists who are

exempt from FLSA overtime pay requirements under 29 U.S.C. § 207(i), (5) there is no evidence

of any actual system-wide policy or practice of failing to compensate employees in accordance

-1-

with the FLSA, and (6) possible FLSA violations by Defendants are *de minimus*.

FACTS[1]

Defendant Brelian, doing business as TGF Precision Haircutters,[2] conducts a hair-styling operation in over 100 locations in Texas. This suit was filed on September 10, 2003, as an "Original Collective Action Complaint," naming only Celia Johnson as plaintiff, and alleging that TGF "failed to pay overtime for all hours worked by Plaintiffs in excess of 40 per workweek." In fact, according to her payroll records, Plaintiff worked on the average only 35 hours a week.[3]

The complaint was later amended to add Brelian and Tavakoli as defendants, and **only after** the Policies and Procedures Manual (See Exhibit 2, *infra.*) was produced in discovery did Plaintiff seek to add allegations of FLSA violations of requiring employees to "work off the clock," contending that they allegedly did not even receive minimum wage for all hours worked. In a *Memorandum and Order*[4] dated June 1, 2004, this court conditionally certified a class of hair

---

[1]     The Facts asserted herein are supported by affidavits from Defendant Frank Tavakoli (Exhibit A) and Finis Wilmoth (Exhibit B), and exhibits attached hereto. For the Court's convenience, Defendants have provided a Chart summarizing many of the exhibits attached hereto (Exhibit C).

[2]     Defendant TGF is a corporation with no involvement in the business operations or activities of defendant Brelian. Frank Tavakoli is the President of Brelian. All of the opt-ins were employed only by Brelian.

[3]     See Exhibit 1, which shows a summary of Ms. Johnson's payroll records with hours paid throughout her employment. This summary was taken directly from the payroll records. Exhibit 1 reflects Plaintiff's hours paid per week and pay checks issued every other week throughout her employment.

[4]     See Johnson v. TGF Precision Haircutters, Inc., 319 F.Supp.2d 753 (S.D. Tex. 2004): the court order specifically covers only stylists and receptionists. Id. at p. 755.

stylists and receptionists employed during the three-year period preceding the sending of the notices, based primarily on self-serving identically worded affidavits from Plaintiff and several opt-ins, and in language in stray remarks in an employment manual, produced by Brelian after this suit was filed, which, if followed, would require employees to arrive at work 15 minutes prior to store opening, to remain a few minutes after store closing, and to clock out when taking unscheduled breaks for smoking, or for telephone calls. Each store had one "Policies and Procedures Manual"[5] which was supplemented and revised on an irregular basis. The 2002-2003 manual contained 78 pages. The primary purpose of the manual, which is no longer in force, was to furnish advice and instruction on the treatment of customers, store operating procedures, hair styling and products for sale. However, the manual, which states that employees are to arrive a few minutes before opening to set up, and stay a few minutes after closing to clean up, instructs employees to make sure and record the extra time on the clock (See Exhibit 2, p. 20); and informs them that they should not clock out for legitimate breaks (Exhibit 2, p. 43). Receptionists, primarily hourly paid, are scheduled to arrive 15 minutes early (Exhibit 2 p. 45), which means the hours are recorded. The stylists are exempt from the FLSA overtime requirements, as previously discussed, so any overtime hours by stylists are irrelevant in the context of this lawsuit.

Plaintiffs' attorneys sent notices to nearly four thousand potential opt-ins, consisting of approximately 940 currently employed Brelian employees and the balance of Brelian ex-

---

[5] Exhibit 2 is a copy of the Policies and Procedures Manual.

employees, all of whom presumably were employed during the preceding three year period.[6] The opt-in period was for 90 days, from July 19, 2004, until October 19, 2004. A total of 264 recipients of the notices returned consents to become plaintiffs in the suit.[7] Of the approximate 940 current employees of Brelian, Inc., **only 21** filed consents to become plaintiffs in this action. At least 32 of the opt-ins are not eligible to join the suit because either their notices were filed late (2)[8], they were not employed by Brelian during the three-year period preceding the notice period (24)[9], or they were supervisors (4) or office workers (2), job classifications not covered by the court order,[10] which specified only hair stylists and receptionists. Accordingly, 232 of the opt-ins are potentially eligible.[11]

Seventy-four (74) of the potentially eligible opt-ins were employed by Brelian for thirteen weeks or less, so that their claims, if any, could only be *de minimus.*[12]

---

[6]      Plaintiff sent multiple notices to the potential opt-ins, an activity that ceased only when complained about by Defendants in their Expedited Motion to Restrain Future Re-mailing of Notices.

[7]      Four persons filed two consent forms each. The number "264" takes that into account.

[8]      Darla George and Patrice Walden-Davies.

[9]      See Exhibit 3.

[10]      See Exhibit 4, which is a summary of these persons by classification, taken from the payroll records. Job titles reflected on several reports attached as exhibits represent the job title of the person either as of his/her last paycheck or as of the payroll closest to the close of the opt-in period (October 19, 2004).

[11]      Although 264 persons opted in, the existing data base only consists of 258 persons.

[12]      See Exhibit 5, which is a summary of these persons by number of weeks worked, taken from the payroll records.

Brelian receptionists and hair stylists are paid in a multitudinous variety of ways, depending upon experience level, location of salon, and independent relationship between the employee and management of Defendant Brelian. Receptionists are primarily paid by the hour, in a range from $5.15 to $8.00 per hour[13], although some are paid commissions on sales of products to customers who visit the store only to buy products. Hair stylists are paid primarily in the following ways, although some have different "arrangements," based on a variety of factors related to their employment history:

1.  Stylists are paid the greater of (a) an hourly rate in varying amounts times the number of hours worked up to 40 hours per week, and one and one-half their regular rate per hour for all hours worked over 40 hours per week, or (b) commissions consisting of the aggregate of 40 per cent of styling service income, 20 per cent of income from the sale of house products, and 10 per cent of the income from the sale of other products.

2.  Managers are paid a varying amount of a specific guarantee or, in the alternative, commissions of from 40 to 50 per cent of styling services plus the standard commissions on products, whichever is greater. Attached as Exhibit 7 are notes on payroll records of all opt-ins who, during the three year period in issue, held the position of Manager, which also reflects a variety of supplemental payments. Exhibit 8 is a week by week summary for each of the persons, who held the position of Manager and who received separate weekly supplements, also

---

[13]   See Exhibit 6, Employee__Opt Receptionist rate, which is a summary from the October, 2004, payroll records.

showing how much supplement each received per week.

3.     Assistant managers are paid additional commissions on styling services, plus the

standard commission from the sales of products. Some receive weekly

supplements in varying amounts.[14]

4.     The variety of payment modes is compounded by the practice of moving

employees from store to store and from one pay plan to another multiple times

during their employment, depending on, for example[15]:

a.     experience: A novice stylist will begin with an hourly rate

guarantee, but will later convert to full commission.

b.     store volume (including, for example, when a top performing

stylist is moved to a new store; during the start-up period, the

stylist may receive  guarantees and increased commission

percentages).

---

[14]     Attached as Exhibit 9 are notes on payroll records of all opt-ins who, during the three year period in issue, held the position of Assistant Manager, which reflects the variety of supplemental pay. Exhibit 10 is a week by week summary showing how much supplement each received per week. One received a weekly supplement of $25.00, one received a weekly supplement of $35.00, four received a weekly supplement of $40.00, two received a weekly supplement of $45.00, (one of these received weekly supplements of $45.00 for 4 weeks and $50.00 for six weeks), and nine received a weekly supplement of $50.00. Some were employed as "key holders". They received varying weekly supplements to their regular compensation for opening or closing the store. Different employees may open and close each day. The amount of the supplement varies from individual to individual for the "key holders" just as for the Managers and Assistant Managers. Attached as Exhibit 11 are notes on payroll records of all opt-ins who, during the three year period in issue, held the position of "key holder", which reflects the variety of supplemental pay. Exhibit 12 is a week by week summary showing how much supplement each received per week.

[15]     This is documented by the notes on Exhibits 7, 9 and 11.

     c.     poor performance: a poorly performing stylist on full commission may be converted to hourly pay while undergoing additional training. Once performance improves, the stylist reverts to the previous plan, or to some other plan, depending on what is individually negotiated.

Hair stylists receive tips, which form a significant portion of their income. Although income from tips may be considered under the FLSA when computing minimum wage and overtime pay,[16] income from tips was not considered in computing the compensation of the opt-ins for purposes of this motion. However, of the 176 stylists purportedly qualified to participate in this proceeding, only 26 reported having received tips. Lead Plaintiff Johnson, who worked during 86 weeks, primarily as a stylist-manager, and who averaged 37 hair cuts per week did not report receiving one single tip.

The FLSA provides an exemption from the overtime pay requirements for retail establishment[17] employees who receive more than half of their compensation from commissions, if their rate of pay for all hours worked, including overtime hours, is at least one and one half times the $5.15 per hour minimum wage, or $7.73 per hour.[18] Defendant's payroll records show that a very small number of the opt-ins (four) worked over and average of 40 hours per week.

---

[16]    29 U.S.C. sec. 203(m).

[17]    The Brelian locations are like beauty shops or barber shops, which have always been found to be retail or service establishments in the context of the FLSA under the cases and interpretive regulations. See, e.g., *Roland Elec. Co. V. Walling*, 326 U.S. 657 (1946), and 29 C.F.R. § 779.320.

[18]    29 U.S.C.A. § 207(i).

Those who consistently worked over 40 hours per week were invariably exempt employees,
high-performing hair stylists whose pay was composed entirely or almost entirely of
commissions, and whose income far exceeds $7.73 per hour for all hours worked, including
overtime hours.[19] Of the 40 qualified receptionist opt-ins, 18 worked 13 weeks (one calendar
quarter) or less and 22 worked over 13 weeks.[20] Of the 176 qualified stylist opt-ins, 50 worked
less than 13 weeks.

Employees' time is recorded on time sheets they prepare and submit weekly to the
managers, who review it and then submit it to the main office for payroll purposes.[21] Payroll
clerks input the information from the time sheets into the computer. Exhibit 16 is a CD
containing all of the payroll information for the opt-ins for the three-year period preceding the
sending of the notices, taken from the Brelian computer database, which is generated by a
program which has been continuously in operation since at least the year 2000. This is the
database which forms the basis of the representations made in this motion concerning the
compensation of and hours worked by the opt-ins.

The above-mentioned manual is the source of the allegation in the complaint in this suit

---

[19]    For example, see summary of payroll records of the following opt-ins: Margaret
Bauer, who worked 49 weeks, averaged 41 hours per week, and averaged weekly gross earnings
amounting to $11.28 per hour (Exhibit 13); and Kimberly Schroeder, who worked 29 weeks as a
stylist, averaged 38 hours per week, and averaged weekly gross earnings amounting to $10.06
per hour (Exhibit 14).

[20]    Opt-ins who worked 13 weeks or less could at most have de minimus claims.

[21]    Managers prepare time "schedules," sometimes months in advance, which seldom
prove to be accurate, and are for general guidance. See copies of affidavits of Mary Ann Sanchez
and Amanda Jeneane Hoschar, attached hereto collectively as Exhibit 15. These affidavits were
previously filed with the Court in this matter. Copies of the hand written affidavits and typed
copies are included.

that employees are worked "off the clock." Defendants have conducted surveys amongst current managers[22] to determine if their employees work overtime, and if so if they are properly compensated for overtime; and whether their employees report before store opening or remain after store closing without recording the additional time, or whether their employees "clock out" or deduct the time from their time sheets for time spent on telephone calls or smoke breaks, etc., while still on the store premises. Many of the answers to the surveys varied according to locations and managers. However, the surveys uniformly show that, with remarkably few exceptions, the managers surveyed reported that their employees:

1.     Rarely work overtime;

2.     If they do work overtime they are appropriately compensated;

3.      They do not arrive before store opening, or remain after store closing;

4.      If they do arrive early or remain late they accurately and appropriately record their time;

5.     They are paid for all time worked; and

6.     They are not required to "clock out" for smoke breaks, telephone calls, etc.

Exhibit 17 consists of copies of the actual survey results.

A review of the payroll records of the opt-ins also shows:

1.     During her employment at Brelian, Plaintiff Johnson was paid for an average of 35 hours per week. Her time sheets show she never was docked for short breaks.

2.     None of the opt-ins were ever docked for short breaks; the only deduction from

---

[22]     This occurred after the close of the opt-in period and was only conducted among managers who had not opted into this suit.

time sheets is one-half hour per day for lunch for employees who worked an eight hour shift.

3.     For all of the 258 opt-ins,  the aggregate amount of $13.25 is due to a total of 3 employees for unpaid wages.  Exhibit 18 is a schedule of the opt-ins showing individual employees to whom overtime pay is due, and the respective amounts. **The payroll recaps further show that, even if 3 hours are added to the weekly work schedule of each opt-in, to account for the alleged but unproven work "off the clock," only an aggregate amount of $5,628.00 would be due to all of the opt-ins combined.**

4.     142 of the opt-ins (including unqualified opt-ins) were part-time employees, who worked an average of 30 hours or less. They obviously did not work overtime.[23]

5.     Only 67 of the opt-ins worked on the average 35 hours per week or more.[24]

6.     All of the receptionists who opted-in were hourly paid, and all of the stylists (including key holders, assistant managers and managers), who opted-in received more than half their income from commissions for hair stylings and product sales. The latter group are exempt from overtime pay requirements if their average hourly rate of pay exceeded $7.73 per hour, regardless of the number of hours worked over a representative period of time of not less than one month. As a practical matter, those commission-paid stylists who worked overtime were the

---

[23]     Exhibit 19 is a summary of information from the payroll records.

[24]     Exhibit 20 is a summary of information from the payroll records.

biggest earners, and invariably earned far in excess of $7.73 per hour.

7.      Of those 190 opt-ins whose pay was comprised of more than half of commission income, 134 earned more than an average of $7.73 per hour for all hours worked, including hours in excess of 40 per week, so they would all be exempt from overtime pay requirements.[25]  Further, of those 134 persons, 99 earned an average hourly rate in excess of $8.25 (several earned significantly higher average hourly rates), much more than required to cover any alleged time "worked off the clock."

8.      The qualified opt-ins were employed in at least 90 separate store locations, with separate, independent, store management. During the relevant period, Brelian has consistently employed, in addition to the corporate officers,  a general manager and only between four and six supervisors to supervise as many as 130 separate store locations. Necessarily, therefore, the management of the stores and supervision of receptionists and hair stylists are almost totally within the discretion of the managers and assistant managers, with very different policies and working conditions, as is shown by the results of the recent surveys of the managers (Exhibit 17).

## ARGUMENT

### THE QUALIFIED OPT-INS ARE NOT SIMILARLY SITUATED

The opt-ins qualified to participate in this lawsuit, because they are receptionists or hair

---

[25]     See Exhibit 21, which is a summary of the payroll records for each of the 258 opt-ins, sorted by average hourly rate for the period of time worked.  The summary of those payroll records reflect that those opt-ins who did not average in excess of $7.73 per hour, did not average 40 hours of work in a week over a representative period of time.

stylists who worked for TGF within the three year period preceding the filing of the complaint, and returned their consent forms during the requisite period, do not make a suitable class for an FLSA action because they are not "similarly situated," within the guidelines of *Moody v. Aramco Services, Co.*, 54 F.3d 1207 (5th Cir. 1995), which is the lead case in the Fifth Circuit regarding decertification of a conditionally certified class, because:

    a.    They worked at 90 or more separate locations under separate independent management with varying policies and working conditions.

    b.    Their pay plans varied tremendously. Some were paid strictly by the hour at a rate individually set in different amounts; some were paid an hourly wage plus commissions, supplements, and/or key holder pay, in various combinations, and in different amounts. This means that different inquiries and calculations would be required in almost every instance to determine if the FLSA was violated.

    c.    Some worked part time and some worked full time. Part time workers by definition would not work over 40 hours per week so as to invoke the FLSA overtime pay requirements.

    d.    The payroll records reflect that none of the hourly paid receptionists were entitled to FLSA-required overtime pay because they all averaged less than 40 hours per week. Accordingly, there was no systematic overtime work by receptionists. The hair stylists, virtually all of whom received more than half of their wages from

-12-

commissions, and earned over $7.73 per hour, were exempt from the FLSA overtime pay requirements.

e.   Many worked for TGF a very short period of time, so that their claims, if any, would be *de minimus* at most.

f.   Commensurate with the plethora of varying factors involved in the employment history of the opt-ins, as discussed *infra*, Defendants' defenses to the claims of the opt-ins are equally numerous and varying.

## AUTHORITIES

In the case of *Mooney v. Aramco Services Co., supra.,* the Court granted a motion to decertify a conditionally certified class as not similarly situated on facts remarkably similar to this case. In *Mooney,* the employees were in ninety three different departments and eleven different locations, *Id* at p. 1214; here, the employees were in at least 90 locations, also under separate and independent management. In this case, as in *Mooney,* the treatment received by an employee depended almost entirely on the employee's manager and supervisor. *Id.* at p. 1214 - 1215. Also as in *Mooney,* in this case the opt-ins had different job titles, different skills and duties, and various modes and rates of compensation. *Id* at p. 1214 - 1215.

The Court of Appeals for the Fifth Circuit apparently has not ruled on a decertification issue in an FLSA collective action opt-in case since *Mooney;* however, in another very recent FLSA collective action case with allegations of minimum wage and overtime laws, *Basco v. Wal-Mart Stores Inc.,* 2004 WL 1497709 (E.D. La. 2004), a Federal District court in Louisiana denied a motion for certification and to approve notice. The facts relied upon by the court were very

similar to those in this case. While recognizing that the decision to decertify was usually made as a "second determination," because of the lenient standard at the first determination, the court decided that it could make the final determination at the first stage:

> Because the aim of collective actions is to promote judicial economy, and substantial discovery has already been undertaken such that the Court can make an educated decision as to whether certifying this matter as a collective action would survive the decertification process....*Wal-Mart Stores Inc.*, at p. 5.

The court went on to find that there were "disparate factual and employment settings of the individual plaintiffs," and that the defendant could assert "disparate individual defenses," and would be entitled in individual cases to, among other things, "contest whether any off-the clock work occurred and whether it resulted in nonpayment of FLSA overtime," "argue specific defenses available under the FLSA that seem to require individual testimony...," "demonstrate its managers and supervisors did not know about the off-the clock work, and that plaintiffs failed to take advantage of Wal-mart's system for reporting time," "demonstrate that any off-the -clock work falls within the *de minimus* exception to the FLSA," and "demonstrate that each manager acted in good faith and that liquidated damages are not appropriate," and that **"the potential opt-in plaintiffs performed different jobs at different geographic locations and were subject to different managerial requirements which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis."** *Id.* **at p. 8.** (emphasis added). In this case, the class was conditionally certified under the "lenient" standard, the notices have been sent, and the burden on Plaintiff to justify continued certification is much greater.

## THE RECORDS ESTABLISH THAT
## THERE ARE NO SYSTEMIC FLSA VIOLATIONS

The payroll records establish that the opt-ins were not required to work off the clock,[26] that receptionists, mostly hourly paid, did not work over forty hours per week, and that commission-paid stylists (including key holders, assistant managers and managers) are exempt because more than half of their compensation is derived from commissions; and because their hourly wage over a representative period exceeds seven dollars and seventy-three cents ($7.73) per hour. Those records also support Defendants' assertions that the same employment conditions existed system-wide during the three year period preceding the opt-in date, notwithstanding the tremendous variations in other terms and conditions of employment of the qualified opt-ins.

## CONCLUSION

No legitimate purpose would be served by prolonging this exceedingly expensive, distracting, time-consuming, and frivolous litigation, as a collective action. Because the qualified opt-ins are not similarly situated, to deal with them as a class would be an inefficient and wasteful expenditure of the court's and the parties' time and resources. All relevant documents in the possession and control of Defendants have been provided to Plaintiffs. Extensive discovery in the form of answers to interrogatories and production of documents has been provided to Plaintiff by Defendants prior to and after the notice period. Tavakoli has been deposed and has provided affidavits on key points in support of previously filed pleadings.  All credible evidence indicates that the conditionally certified class is not similarly situated, and that in any event no systematic FLSA violations occurred, so as to justify a collective action. The only discovery which should

---

[26]     Nor do they actually clock out for 15 minute breaks; Exhibit 2, p. 43.

reasonably take place in the future[27] if this motion is not granted are the depositions of the opt-ins and the answers to interrogatories and production of documents from the opt-ins, which would further support Defendants' positions but which, it is respectfully asserted, are not necessary for the court to grant this motion.

Defendants have established under the *Mooney* standard that the conditionally certified class should be decertified. Accordingly, the class should be decertified.

Respectfully submitted,

Michael Jay Kuper *[signature]*
Texas Bar #11765000, Federal ID #6721
Michael Jay Kuper, a Professional Corporation
2800 Post Oak Blvd., 61st Floor
Houston, Texas 77056
713-892-4888
713-892-4828 (Facsimile)

*with permission

Raymond L. Kalmans
Texas Bar #11083000, Federal ID #2284
Schlanger, Silver, Barg & Paine, LLP
109 N. Post Oak Lane, Suite 300
Houston, Texas 77024
713-735-8585
713-785-2091 (Facsimile)

Attorneys for Defendants

---

[27]     A barrage of additional discovery requests from Plaintiff has recently been received and is being responded to. It is respectfully submitted that the responses to this latest discovery requests contain information duplicative of that already produced and/or contained in this motion.

## CERTIFICATE OF SERVICE

I hereby certify that on this the 6th day of January, 2005, a true and correct copy of the foregoing document has been delivered by messenger to the following counsel of record, Mr. David George, Edwards & George, LLP, 1000 Louisiana, Suite 1300, Houston, Texas 77057.

Raymond L. Kalmans

TAB A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CELIA JOHNSON, Individually and on Behalf of all Others Similarly Situated, | § § § | |
| **Plaintiffs** | § § | |
| V. | § § | CIVIL ACTION NO. H-03-3641 |
| TGF PRECISION HAIRCUTTERS, INC., BRELIAN, INC. and FRANK TAVAKOLI, | § § § | |
| **Defendants** | § § | |

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | **AFFIDAVIT OF FRANK TAVAKOLI** |
| COUNTY OF HARRIS | § | |

Comes now Frank Tavakoli, who after being first sworn, makes the following statement under oath.

1. My name is Frank Tavakoli, and I am President of Brelian, Inc., a defendant in this cause. I am over the age of 21 years, have never been convicted of a felony, and am competent to make this affidavit.

2. The information recorded in our computer system is made at or near the time of the events recorded by, or from information transmitted by, a person with knowledge, is kept in the course of a regularly conducted business activity, and it was the regular practice of Brelian, Inc. to make the data compilations maintained within the payroll data base of its computer system.

3. I have reviewed the foregoing Motion to Decertify Class in the above-referenced case and can state from my personal knowledge that the statements made and descriptions concerning the business practices, policies, and terms and conditions of employment for employees of Brelian, Inc. as contained in this Motion are true and correct.

_____
Frank Tavakoli

The foregoing affidavit was signed and sworn to before me on this 6th day of January, 2005 by Frank Tavakoli.

MYONG H. YIM
MY COMMISSION EXPIRES
JUNE 2, 2005

_____
Notary Public in and for the State of Texas

TAB B

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CELIA JOHNSON, Individually and on Behalf of all Others Similarly Situated, | § § § | |
| **Plaintiffs** | § § | |
| V. | § § § | CIVIL ACTION NO. H-03-3641 |
| TGF PRECISION HAIRCUTTERS, INC., BRELIAN, INC. and FRANK TAVAKOLI, | § § § | |
| **Defendants** | § § | |

| | | |
|---|---|---|
| STATE OF TEXAS | § § | **AFFIDAVIT OF FINIS WILMOTH** |
| COUNTY OF HARRIS | § | |

Comes now Finis Wilmoth, who after being first sworn, makes the following statement under oath.

1.    My name is Finis Wilmoth, and I am President of Integrated Software Solutions of Texas, Inc., a Texas Corporation. I am over the age of 21 years, have never been convicted of a felony, and have personal knowledge of the facts contained within this affidavit.

2.    I have provided services to Brelian, Inc. as an independent contractor since about 1998. I designed the payroll program, which Brelian has used, and that program has been in use since the year 2000.

3.    I am familiar with the reports attached to the Defendants' Motion to Decertify Class. I prepared the various reports from information contained within the payroll data base used by Brelian, Inc. The information contained within that data base was entered by accounting department employees of Brelian in the regular course of their business for generating payroll for all of Brelian's employees. In addition, I provided the information contained within the CD contained in Defendants' Exhibit 16 from the payroll information contained within Brelian's payroll data base, which is used to pay Brelian's employees.

4.      The reports attached as exhibits to the Defendants' Motion to Decertify Class are correct summaries of information contained within Brelian's payroll data base.

5.      The foregoing is true and correct.

Finis Wilmoth

Signed and sworn to before me on this 6th day of January, 2005 by Finis Wilmoth.

Notary Public in and for the State of Texas

SUSAN L. WILSON
Notary Public
STATE OF TEXAS
My Comm. Exp. 10-20-2008

TAB C

# Exhibit C to Defendants' Motion to Decertify Class

| | | |
|---|---|---|
| 4000+ | | Approximate number of notice sent out by Plaintiffs. |
| 940 | | Approximate number of current employees of Brelian as of July 2004 |
| 264 | | Number of Opt-ins. |
| -32 | 2 | Number of Opt-ins not qualified. |
| | 24 | Number of Opt-ins filing late. |
| | 4 | Number of Opt-ins not working within 3 years of notices being filed. |
| | 2 | Number of Opt-ins who were supervisors. |
| | | Number of Opt-ins who were office workers. |
| 232 | | Number of potentially qualified opt-ins. |
| 74 | | Number of potentially qualified opt-ins who worked 1-13 weeks during relevant time frame. |
| 42 | | Number of receptionists working an average of 30 hours per week or less. |
| 4 | | Number of receptionists working an average of more than 30 hours per week. |
| 100 | | Number of stylists, keyholders, assistant managers & managers working an average of 30 hours per week or less. |
| 112 | | Number of stylists, keyholders, assistant managers & managers working an average of more than 30 hours per week. |
| 21 | | Number of Opt-ins who were employed by Brelian at the time their opt-in notices were filed with the Court. |
| 67 | | Number of Opt-ins who worked an average of 35 hours or more per week. |
| 90 | | Number of different stores in which the Opt-ins worked, the  vast majority of which had a separate manager and/or assistant manager. |
| $13.25 | | Total Amount due all opt-ins based upon payroll records of Defendant Brelian. |
| $5,628.38 | | Total Amount due all opt-ins based upon payroll records of Defendant Brelian with addition of 3 hours to each opt-in's average hours worked per week. |

TAB 1

**EXHIBIT 1**

| Name CELIA JOHNSON | | | | | Date Filed | | 9/13/2003 | Number | | 50746 | Title | Manager 86 | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hired 12/1/2001 | | | | | Last Paid | | 9/5/2003 | Active | | No | Weeks Work | | $5.15 |
| Store | Period | Wk | Hours | Service | Product | Ttl Sales | Srvc Paid | Prod Paid | Gross | | | | |
| 38 | 200125 | 2 | 40.00 | $850.70 | $25.85 | $876.55 | $340.28 | $5.17 | $345.45 | | | | |
| 38 | 200126 | 1 | 40.00 | $694.60 | $0.00 | $702.55 | $280.00 | $0.00 | $280.00 | | | | |
| 38 | 200126 | 2 | 38.50 | $656.30 | $69.72 | $726.02 | $262.52 | $13.07 | $275.59 | | | | |
| 38 | 200201 | 1 | 35.75 | $560.95 | $9.56 | $570.51 | $224.38 | $1.91 | $226.29 | | | | |
| 38 | 200201 | 2 | 20.00 | $312.90 | $10.95 | $323.85 | $125.16 | $1.10 | $126.26 | | | | |
| 38 | 200202 | 1 | 26.75 | $417.40 | $0.00 | $417.40 | $166.96 | $0.00 | $166.96 | | | | |
| 38 | 200202 | 2 | 27.00 | $469.00 | $17.90 | $486.90 | $187.60 | $3.58 | $191.18 | | | | |
| 38 | 200203 | 1 | 39.00 | $592.45 | $0.00 | $592.45 | $236.98 | $0.00 | $236.98 | | | | |
| 38 | 200203 | 2 | 38.75 | $552.45 | $8.95 | $561.40 | $220.98 | $1.79 | $222.77 | | | | |
| 38 | 200204 | 1 | 35.25 | $507.50 | $77.68 | $585.18 | $203.00 | $12.65 | $215.65 | | | | |
| 38 | 200204 | 2 | 36.25 | $690.30 | $58.70 | $749.00 | $276.12 | $11.15 | $287.27 | | | | |
| 38 | 200205 | 1 | 30.50 | $643.45 | $32.80 | $676.25 | $257.38 | $5.97 | $263.35 | | | | |
| 38 | 200205 | 2 | 31.50 | $684.00 | $52.00 | $736.00 | $273.60 | $8.29 | $281.89 | | | | |
| 38 | 200206 | 1 | 26.50 | $515.05 | $54.70 | $569.75 | $206.02 | $9.65 | $215.67 | | | | |
| 38 | 200206 | 2 | 31.25 | $456.25 | $0.00 | $456.25 | $182.50 | $0.00 | $182.50 | | | | |
| 38 | 200207 | 1 | 28.50 | $517.50 | $38.35 | $555.85 | $207.00 | $5.63 | $212.63 | | | | |
| 38 | 200207 | 2 | 38.00 | $533.35 | $18.90 | $552.25 | $213.34 | $2.79 | $216.13 | | | | |
| 38 | 200208 | 1 | 34.00 | $544.30 | $12.95 | $557.25 | $217.72 | $1.30 | $219.02 | | | | |
| 38 | 200208 | 2 | 30.00 | $392.05 | $41.91 | $433.96 | $156.82 | $7.29 | $164.11 | | | | |
| 38 | 200209 | 1 | 34.25 | $644.55 | $35.90 | $680.45 | $257.82 | $5.38 | $263.20 | | | | |
| 38 | 200209 | 2 | 33.50 | $516.35 | $0.00 | $516.35 | $206.54 | $0.00 | $206.54 | | | | |
| 38 | 200210 | 1 | 24.00 | $402.90 | $32.35 | $435.35 | $161.16 | $5.72 | $166.88 | | | | |
| 38 | 200210 | 2 | 37.75 | $755.15 | $23.90 | $779.05 | $302.06 | $4.78 | $306.84 | | | | |
| 38 | 200211 | 1 | 38.50 | $532.85 | $8.50 | $541.35 | $213.14 | $1.70 | $214.84 | | | | |
| 38 | 200211 | 2 | 39.00 | $572.10 | $7.95 | $580.05 | $228.84 | $1.59 | $230.43 | | | | |
| 38 | 200212 | 1 | 40.00 | $567.75 | $47.80 | $615.55 | $232.10 | $6.77 | $238.87 | | | | |
| 38 | 200212 | 2 | 40.00 | $606.30 | $34.80 | $641.10 | $267.52 | $6.96 | $274.48 | | | | |
| 38 | 200213 | 1 | 38.50 | $452.80 | $75.70 | $528.50 | $205.18 | $15.14 | $220.32 | | | | |
| 38 | 200213 | 2 | 40.00 | $774.35 | $13.45 | $787.80 | $334.74 | $1.35 | $336.09 | | | | |
| 38 | 200214 | 1 | 40.00 | $587.55 | $31.80 | $619.35 | $260.02 | $5.57 | $265.59 | | | | |
| 38 | 200214 | 2 | 40.00 | $658.65 | $59.20 | $717.85 | $288.46 | $9.70 | $298.16 | | | | |
| 38 | 200215 | 1 | 40.00 | $721.80 | $9.95 | $731.75 | $373.87 | $1.99 | $375.86 | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 38 | 200215 | 2 | 40.00 | $830.85 | $19.95 | $850.80 | $420.44 | $3.99 | $424.43 |
| 38 | 200216 | 1 | 40.00 | $747.70 | $62.40 | $810.10 | $369.20 | $10.53 | $379.73 |
| 38 | 200216 | 2 | 37.50 | $578.10 | $66.70 | $644.80 | $291.32 | $13.34 | $304.66 |
| 38 | 200217 | 1 | 39.00 | $664.95 | $31.50 | $696.45 | $290.36 | $4.94 | $295.30 |
| 38 | 200217 | 2 | 40.00 | $879.05 | $36.91 | $915.96 | $376.62 | $5.50 | $382.12 |
| 38 | 200218 | 1 | 40.00 | $609.35 | $9.95 | $619.30 | $352.90 | $1.99 | $354.89 |
| 38 | 200218 | 2 | 24.25 | $392.55 | $18.50 | $411.05 | $182.02 | $2.85 | $184.87 |
| 38 | 200219 | 1 | 32.00 | $295.05 | $23.85 | $318.90 | $118.02 | $4.77 | $122.79 |
| 38 | 200219 | 2 | 36.00 | $696.00 | $20.31 | $716.31 | $278.40 | $3.66 | $282.06 |
| 38 | 200220 | 1 | 30.00 | $476.50 | $37.80 | $514.30 | $190.60 | $7.56 | $198.16 |
| 38 | 200220 | 2 | 36.50 | $847.40 | $63.61 | $922.96 | $338.96 | $12.72 | $351.68 |
| 38 | 200221 | 1 | 40.00 | $613.00 | $72.80 | $685.80 | $245.20 | $14.56 | $259.76 |
| 38 | 200221 | 2 | 21.75 | $710.20 | $45.80 | $756.00 | $284.08 | $9.16 | $293.24 |
| 38 | 200222 | 1 | 23.75 | $259.25 | $43.86 | $303.11 | $103.70 | $7.68 | $111.38 |
| 38 | 200222 | 2 | 31.75 | $355.00 | $9.95 | $364.95 | $142.00 | $1.99 | $143.99 |
| 38 | 200223 | 1 | 26.75 | $475.90 | $21.45 | $510.30 | $190.36 | $4.29 | $194.65 |
| 38 | 200223 | 2 | 40.00 | $510.95 | $69.70 | $580.65 | $204.38 | $12.99 | $217.37 |
| 38 | 200226 | 1 | 40.00 | $354.39 | $7.95 | $362.34 | $141.76 | $1.59 | $143.35 |
| 38 | 200301 | 2 | 38.50 | $469.09 | $33.52 | $502.61 | $206.00 | $0.00 | $206.00 |
| 38 | 200301 | 1 | 40.00 | $319.49 | $20.45 | $339.94 | $433.45 | $0.00 | $433.45 |
| 38 | 200302 | 2 | 39.00 | $420.32 | $11.00 | $431.32 | $168.13 | $1.10 | $169.23 |
| 38 | 200302 | 1 | 40.00 | $380.63 | $50.11 | $430.74 | $152.25 | $7.30 | $159.55 |
| 38 | 200303 | 2 | 39.50 | $486.07 | $14.32 | $500.39 | $194.43 | $2.86 | $197.29 |
| 38 | 200303 | 1 | 23.00 | $287.39 | $10.36 | $297.75 | $114.96 | $2.07 | $117.03 |
| 38 | 200304 | 2 | 34.50 | $347.36 | $18.36 | $365.72 | $138.94 | $2.55 | $141.49 |
| 38 | 200304 | 1 | 27.50 | $526.26 | $22.82 | $549.08 | $210.50 | $3.71 | $214.21 |
| 38 | 200305 | 2 | 21.50 | $390.33 | $11.95 | $402.28 | $156.13 | $2.39 | $158.52 |
| 38 | 200305 | 1 | 32.50 | $301.99 | $40.72 | $342.71 | $120.80 | $8.14 | $128.94 |
| 38 | 200306 | 2 | 39.00 | $305.60 | $58.64 | $364.24 | $260.00 | $0.00 | $260.00 |
| 38 | 200306 | 1 | 33.50 | $413.36 | $82.90 | $496.26 | $312.00 | $0.00 | $312.00 |
| 38 | 200307 | 1 | 27.50 | $477.35 | $57.68 | $535.03 | $320.00 | $0.00 | $320.00 |
| 38 | 200307 | 1 | 28.00 | $206.18 | $6.36 | $212.54 | $268.00 | $0.00 | $268.00 |
| 38 | 200308 | 2 | 40.00 | $317.65 | $24.68 | $342.33 | $220.00 | $0.00 | $220.00 |
| 38 | 200308 | 1 | 40.00 | $180.05 | $66.08 | $246.13 | $224.00 | $0.00 | $224.00 |
| 38 | 200309 | 2 | 40.00 | $308.35 | $73.08 | $381.43 | $370.00 | $0.00 | $370.00 |
| 38 | 200309 | 2 | 40.00 | $249.70 | $22.72 | $272.42 | $411.20 | $0.00 | $411.20 |

| Store | Period | | Hours | Date | Gross | Deduct | Net | Vacation | Tips |
|---|---|---|---|---|---|---|---|---|---|
| 38 | 200310 | 1 | $236.05 | $7.16 | $243.21 | $217.38 | $0.00 | $217.38 | $0.00 |
| 38 | 200310 | 2 | $465.90 | $88.61 | $554.51 | $351.50 | $0.00 | $351.50 | $0.00 |
| 38 | 200311 | 1 | $624.55 | $56.14 | $680.69 | $370.00 | $0.00 | $370.00 | $0.00 |
| 38 | 200311 | 2 | $393.00 | $7.16 | $400.16 | $370.00 | $0.00 | $370.00 | $0.00 |
| 38 | 200312 | 1 | $546.25 | $17.36 | $655.51 | $370.00 | $0.00 | $370.00 | $0.00 |
| 38 | 200312 | 2 | $447.35 | $15.45 | $462.80 | $370.00 | $0.00 | $370.00 | $0.00 |
| 38 | 200313 | 1 | $554.10 | $40.27 | $594.37 | $370.00 | $0.00 | $370.00 | $0.00 |
| 38 | 200313 | 2 | $516.65 | $16.76 | $533.41 | $370.00 | $0.00 | $370.00 | $0.00 |
| 38 | 200314 | 1 | $430.95 | $30.28 | $461.23 | $363.94 | $6.06 | $370.00 | $0.00 |
| 38 | 200314 | 2 | $531.85 | $11.00 | $542.85 | $228.70 | $1.10 | $229.80 | $0.00 |
| 38 | 200315 | 1 | $349.85 | $13.52 | $363.37 | $150.44 | $2.70 | $153.14 | $0.00 |
| 38 | 200315 | 2 | $561.94 | $39.08 | $601.02 | $241.63 | $6.62 | $248.25 | $0.00 |
| 38 | 200316 | 1 | $486.66 | $37.35 | $524.01 | $320.00 | $0.00 | $320.00 | $0.00 |
| 38 | 200316 | 2 | $857.11 | $113.88 | $970.99 | $491.90 | $18.40 | $510.30 | $0.00 |
| 38 | 200317 | 1 | $752.08 | $57.36 | $823.39 | $427.25 | $11.47 | $438.72 | $0.00 |
| 38 | 200317 | 2 | $682.95 | $49.36 | $798.26 | $401.43 | $9.87 | $411.30 | $0.00 |
| 38 | 200318 | 1 | $537.79 | $309.11 | $998.40 | $206.00 | $0.00 | $206.00 | $0.00 |
| 38 | 200318 | 2 | $198.75 | $20.36 | $228.10 | $51.50 | $0.00 | $51.50 | $0.00 |
| **Store** | **Period** | | **Hours** | **Date** | **Gross** | **Deduct** | **Net** | **Vacation** | **Tips** |
| 106 | 200125 | | 40 | 12/14/2001 | $345.45 | $26.43 | $319.02 | $0.00 | $0.00 |
| 106 | 200126 | | 78.5 | 12/28/2001 | $555.59 | $71.92 | $483.67 | $0.00 | $0.00 |
| 38 | 200226 | | 40 | 12/27/2002 | $143.35 | $10.97 | $132.38 | $0.00 | $0.00 |
| 106 | 200205 | | 62 | 3/8/2002 | $545.24 | $59.90 | $485.34 | $0.00 | $0.00 |
| 106 | 200206 | | 57.75 | 3/22/2002 | $398.17 | $33.94 | $364.23 | $0.00 | $0.00 |
| 106 | 200207 | | 66.5 | 4/5/2002 | $428.76 | $39.34 | $389.42 | $0.00 | $0.00 |
| 106 | 200208 | | 64 | 4/19/2002 | $383.13 | $31.29 | $351.84 | $0.00 | $0.00 |
| 106 | 200209 | | 67.75 | 5/3/2002 | $469.74 | $46.57 | $423.17 | $0.00 | $0.00 |
| 106 | 200210 | | 61.75 | 5/17/2002 | $473.72 | $47.27 | $426.45 | $0.00 | $0.00 |
| 106 | 200211 | | 77.5 | 5/31/2002 | $445.27 | $42.26 | $403.01 | $0.00 | $0.00 |
| 106 | 200212 | | 80 | 6/14/2002 | $513.35 | $54.27 | $459.08 | $0.00 | $0.00 |
| 106 | 200213 | | 78.5 | 6/28/2002 | $556.41 | $61.87 | $494.54 | $0.00 | $0.00 |
| 106 | 200214 | | 80 | 7/12/2002 | $563.75 | $63.16 | $500.59 | $0.00 | $0.00 |
| 106 | 200215 | | 80 | 7/26/2002 | $800.29 | $104.91 | $695.38 | $0.00 | $0.00 |
| 106 | 200216 | | 77.5 | 8/9/2002 | $684.39 | $84.45 | $599.94 | $0.00 | $0.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 106 | 200201 | 55.75 | 1/11/2002 | $352.55 | $38.97 | $313.58 | $0.00 | $0.00 |
| 106 | 200217 | 79 | 8/23/2002 | $677.42 | $83.22 | $594.20 | $0.00 | $0.00 |
| 106 | 200202 | 53.75 | 1/25/2002 | $358.14 | $27.39 | $330.75 | $0.00 | $0.00 |
| 106 | 200218 | 64.25 | 9/6/2002 | $539.76 | $58.94 | $480.82 | $0.00 | $0.00 |
| 106 | 200203 | 77.75 | 2/8/2002 | $459.75 | $44.81 | $414.94 | $0.00 | $0.00 |
| 106 | 200219 | 68 | 9/20/2002 | $404.85 | $35.12 | $369.73 | $0.00 | $0.00 |
| 106 | 200220 | 70 | 10/4/2002 | $549.84 | $60.71 | $489.13 | $0.00 | $0.00 |
| 106 | 200204 | 71.5 | 2/22/2002 | $502.92 | $52.42 | $450.50 | $0.00 | $0.00 |
| 106 | 200221 | 76.5 | 10/18/2002 | $553.00 | $63.26 | $489.74 | $0.00 | $0.00 |
| 106 | 200222 | 45.5 | 11/1/2002 | $255.37 | $19.53 | $235.84 | $0.00 | $0.00 |
| 106 | 200223 | 58.5 | 11/15/2002 | $412.02 | $36.38 | $375.64 | $0.00 | $0.00 |
| 38 | 200301 | 78.5 | 1/10/2003 | $639.45 | $76.53 | $562.92 | $235.17 | $0.00 |
| 38 | 200302 | 79 | 1/24/2003 | $328.78 | $25.15 | $303.63 | $0.00 | $0.00 |
| 38 | 200303 | 79.5 | 2/7/2003 | $314.32 | $63.94 | $250.38 | $0.00 | $0.00 |
| 38 | 200304 | 57.5 | 2/21/2003 | $355.70 | $67.09 | $288.61 | $0.00 | $0.00 |
| 38 | 200305 | 49 | 3/7/2003 | $287.46 | $21.99 | $265.47 | $0.00 | $0.00 |
| 38 | 200316 | 80 | 8/8/2003 | $830.30 | $110.17 | $720.13 | $0.00 | $0.00 |
| 38 | 200317 | 80 | 8/22/2003 | $850.02 | $114.64 | $735.38 | $0.00 | $0.00 |
| 38 | 200318 | 50 | 9/5/2003 | $257.50 | $19.69 | $237.81 | $0.00 | $0.00 |
| 157 | 200306 | 71.5 | 3/21/2003 | $572.00 | $64.42 | $507.58 | $0.00 | $0.00 |
| 157 | 200307 | 73.5 | 4/4/2003 | $588.00 | $67.26 | $520.74 | $0.00 | $0.00 |
| 157 | 200308 | 55.5 | 4/18/2003 | $444.00 | $41.84 | $402.16 | $0.00 | $0.00 |
| 157 | 200310 | 61.5 | 5/16/2003 | $568.88 | $63.88 | $505.00 | $0.00 | $0.00 |
| 157 | 200311 | 80 | 5/30/2003 | $740.00 | $94.08 | $645.92 | $0.00 | $0.00 |
| 157 | 200312 | 80 | 6/13/2003 | $740.00 | $94.08 | $645.92 | $0.00 | $0.00 |
| 157 | 200313 | 80 | 6/27/2003 | $740.00 | $94.08 | $645.92 | $0.00 | $0.00 |
| 157 | 200314 | 80 | 7/11/2003 | $599.80 | $69.34 | $530.46 | $0.00 | $0.00 |
| 157 | 200315 | 75 | 7/25/2003 | $401.39 | $34.32 | $367.07 | $0.00 | $0.00 |
| 172 | 200309 | 80 | 5/2/2003 | $781.20 | $101.35 | $679.85 | $0.00 | $0.00 |

TAB2

# POLICIES
# &
# PROCEDURES
# MANUAL
# 2002-2003

Revised: <u>September 2002</u>

**8280 WESTPARK DR. • HOUSTON, TEXAS 77063 • TEL 713. 952.8080 • 1.800.622.1330**
**FAX 713.918.8686 • www.tgfhaircutters.com**

### THIS MANUAL CONTAINS CONFIDENTIAL INFORMATION!

This manual is the property of BRELIAN, Inc. d/b/a **TGF** Precision Haircutters and CityCuts (hereafter referred to only as TGF). The material contained herein is confidential to TGF employees and must not be discussed with anyone outside of the company. Unauthorized sharing, copying, photocopying, or duplication of this manual in any way may be considered a violation of company policy whereby the offending employee would face termination and possible legal prosecution.



EXHIBIT
2

# TABLE OF CONTENTS

**MISSION STATEMENT**................................................................ 7

**INTRODUCTION**..................................................................... 7

**WELCOME TO THE TGF FAMILY**

    Brief History of TGF Precision Haircutters........................... 8

    Get Ready for an Exciting Career & The TGF Philosophy...... 8

    Orientation.................................................................. 9

    Equal Employment Policy............................................... 9

**THE FOUNDATION**

    The Company and Its Concept......................................... 10

    The TGF Promise to Our Customers................................. 11

    Teamwork.................................................................. 11

    Our Commitment to Customer Service.............................. 11

**COMPANY BENEFITS: A BRIEF OVERVIEW**

    Promotions................................................................. 13

    Vacation Time............................................................. 13

    Continuing Education.................................................... 14

    Insurance................................................................... 14

    Retirement................................................................. 14

    Holidays.................................................................... 14

    Compensation & Tipping................................................ 14

    Tipping and the IRS...................................................... 15

**GENERAL EMPLOYMENT POLICIES & PROCEDURES**

    New Employee Paperwork.............................................. 15

    Changes in Personal Records.......................................... 16

    Training & Technical Training.......................................... 16

    Certification............................................................... 17

    Employee Probationary Period......................................... 17

    Appearance and Dress Code........................................... 18

    Personal Hygiene......................................................... 18

    Meetings................................................................... 19

    Hours of Operation...................................................... 19

    Work Schedule............................................................ 19

    Clocking In & Start of the Shift....................................... 20

    Clocking Out & End of the Shift...................................... 20

    Absences................................................................... 20

    Leave of Absence........................................................ 22

    Tardiness.................................................................. 22

    Commitment to Quality................................................. 22

    Advancement Opportunities............................................ 22

More Advancement Opportunities……………………………….. 23
Transfers & Inter-salon Transfers……………………………….. 23
Resignations……………………………………………………….. 24
Involuntary Termination…………………………………………… 24
Rehire Policy……………………………………………………….. 25
Theft…………………………………………………………………. 25
Substance Abuse………………………………………………….. 25
Food & Drinks………………………………………………………. 25
Smoking Policy…………………………………………………….. 25
Chewing Gum………………………………………………………. 25
Check Cashing Policy……………………………………………… 26
Safety & Security…………………………………………………… 26
Large Bags & Purses……………………………………………… 26
Parking……………………………………………………………… 26
Back Door Policy…………………………………………………… 26
Recycling Program………………………………………………… 27
Accidents…………………………………………………………… 27
Reporting Injuries………………………………………………….. 27
Sexual Harassment……………………………………………….. 28
Discrimination in the Provision of Services……………………. 28
Conflict of Interest………………………………………………… 29
Authorization of Services………………………………………… 29

## OUR CUSTOMERS & HOW WE SERVE THEM

Introduction…………………………………………………………. 29
Serving All Customers…………………………………………….. 29
Telephone Etiquette & Phone Use……………………………… 30
The Greeting……………………………………………………….. 30
Introducing Yourself………………………………………………. 30
Customer Tickets………………………………………………….. 31
Ticket Policy……………………………………………………….. 32
The Send Off………………………………………………………. 32
Cash Handling…………………………………………………….. 32
Check Policy……………………………………………………….. 33
Credit Card Policy…………………………………………………. 33
Our Guarantee…………………………………………………….. 34
Requests & Request Rate………………………………………… 34
Determining Wait Times………………………………………….. 34
Service Times………………………………………………………. 34
Attitude……………………………………………………………… 35
Complaints…………………………………………………………. 35
Redo Service………………………………………………………. 36
Customer Refunds………………………………………………… 36

## SALON POLICIES & PROCEDURES

On Floor Policies………………………………………………….. 37

Communication with Clients.................................................. 37
The Consultation.............................................................. 38
Neck Strips..................................................................... 38
Cuts & Nicks................................................................... 38
Head Lice....................................................................... 39
Children & First Haircut Certificates...................................... 39
Gift Certificates................................................................ 39
Coupons......................................................................... 39
"Free-Cut" Cards.............................................................. 40
Log Sheets..................................................................... 40
Point of Sales System....................................................... 41
Equipment & Product Usage............................................... 41
Cleaning........................................................................ 41
Duty Roster.................................................................... 41
Lobby Area..................................................................... 42
Station Appearance.......................................................... 42
Texas Cosmetology License............................................... 42
Break Room.................................................................... 42
Restrooms...................................................................... 43
Lunch Breaks & Rest Breaks............................................... 43
Slow Times..................................................................... 43
After Hours Work............................................................. 44
Employee-to-Employee Services.......................................... 44
Employee-to-Friend/Family Services..................................... 44
Employee Product Purchases.............................................. 44
Giving Personal Information to Clients................................... 44

## RECEPTIONIST/FRONT DESK RESPONSIBILITIES

Introduction................................................................... 44
Receptionist Hiring Requirements........................................ 45
Duties & Expectations....................................................... 45
Opening Procedures......................................................... 45
Client Check-in Procedures................................................ 45
Client Check-out Procedures.............................................. 46
Cash Drawer Policies........................................................ 46
Emergency Charge Policy.................................................. 46
Service Redos................................................................. 46
Telephone Procedures...................................................... 47
Phone Use Policy............................................................. 47
Long Distance Calls.......................................................... 47
What Receptionists Should Look For..................................... 47
Dos and Don'ts List.......................................................... 48

## MANAGEMENT RESPONSIBILITIES

Expectations of Managers.................................................. 49
Disciplinary System......................................................... 49

Daily Call Reports................................................................. 50
Paperwork.......................................................................... 51
Salon Keys..........................................................................51
Timesheets......................................................................... 52
Inventory............................................................................. 52
Daily Register Activity Sheets................................................ 52
Scheduling.......................................................................... 53
Labor Cost Control............................................................... 53
Shortcuts to Effective Management......................................... 54
Manager's Daily Checklist...................................................... 56

**APPENDIX I LOSS PREVENTION PROCEDURE**............................. 58

**APPENDIX II (INCLUDES THE FOLLOWING)**................................. 65

Form: Weekly Work Schedule
Sample: Weekly Work Schedule for Four Stylists
Sample: Weekly Work Schedule for Five Stylists
Sample: Weekly Work Schedule for Six Stylists
Form: Product Return/Exchange Form
Form: Store Labor Cost Control
Form: Daily Register Activity
Form: Daily Bottle Count
Form: Guest and Product Count Sheet
Form: Weekly Time Sheet
Form: Vacation Pay Request
Form: Deposit Record
Form: First Report of Injury
Form: Salon Inspection

# TGF PRECISION HAIRCUTTERS

# HANDBOOK

# 2002-2003

## MISSION STATEMENT

**TGF** and **[logo]** aim to provide our customers with the best value and service in the hair care industry while providing our salons with the leadership, support, and assistance to build successful businesses with happy, satisfied employees.

## INTRODUCTION

**TGF** believes it is important you understand your duties and responsibilities as well as our guidelines, so you can build a successful career. This handbook has been designed to provide you with information about the guidelines and procedures that apply to **TGF** salons throughout the country.

The guidelines, procedures and benefits outlined in this handbook may be altered or changed from time to time at the discretion of **TGF**. If changes or alterations occur, **TGF** will inform you.

This handbook or any part of it should not be interpreted or construed to be an employment agreement or contract. If a conflict arises between a statement in this handbook and any federal, state or local statute, the law will prevail.

It is a policy of **TGF** and its management team to consider applicants for employment and advancement on the basis of qualifications without regard to race, color, religion, sex, national origin, age, or sexual orientation.

This handbook is only an orientation. Its purpose is to familiarize you with the **TGF** system. It does not cover procedures in depth; those will be thoroughly covered in your training by a corporate supervisor and periodic Managers' Meetings.

**Welcome aboard and good luck!**

# WELCOME TO THE TGF PRECISION HAIRCUTTERS FAMILY

## A Brief History of TGF

**TGF** has provided Houston with superior hair care service and the finest in hair care products since 1984. In 1984, **TGF** opened with only one salon and has now grown to **more than 130** throughout Texas and Colorado – **and we're still growing!**

The primary reason for this unprecedented growth is the excellent customer service we provide. **TGF** is able to provide superior service because we offer you the latest in training, seminars, and classes in all phases of the salon business: From customer service and management classes to the most current styling techniques and fashion trends in the hair care industry, **TGF** leads the way. **TGF** believes that the best way to attract and maintain clients is to provide people with excellent customer service.

**TGF** recognized that in order to offer the best service, there was a need to provide each customer with quality hair care products. Therefore, **TGF** created its very own line of *shiva* hair and skin care products to meet our customer's needs. *shiva* products are not only the most environmentally friendly products in Texas, but are among the most progressive in the industry.

With all that history behind us, **TGF** is proud to have you on our team! So that you may become a vital part of our team, it is important that you read and follow the rules and procedures contained in this manual and refer to it often throughout your employment with **TGF**. If you have any questions about the materials contained in this manual, please ask your manager. We are very excited to have you on the **TGF** team, and look forward to our future together.

## Get Ready For an Exciting Career!

**TGF** wants suggestions from its employees. Our philosophy is that we work as a team, and therefore we must always be open to new ideas. Sometimes a receptionist or stylist may notice things in the day-to-day operation of the salon that the manager doesn't notice. Therefore, we welcome all suggestions from all employees.

Your job is dependent on the success of the company. It takes money to open a salon, and it takes a profit to keep it open. Your future success on the **TGF** team depends on you doing your job to the best of your ability. Your efficiency will create an atmosphere of accomplishment and personal achievement. You are in a profession where **you can make money – a lot of money,** but you can also make next to nothing if you do not constantly work towards improving your skills. We encourage you to set high goals for yourself and accept nothing less. Just wanting to be successful is not enough. It takes hard work, planning, organization, and training on the latest styles. We at **TGF** want you to be a success, and we believe that on our team you can be a winner.

## The TGF Philosophy:

✄ We provide the highest quality products such as *shiva*, REDKEN, etc.
✄ We provide smoke-free salons.
✄ We employ the best-trained hair stylists in the industry.

8

✂ We use cruelty-free products.
✂ We understand and practice recycling.
✂ We provide a full-service salon for hair.
✂ While no appointment is needed in the salon, we do accept appointments for chemical services.
✂ We have the most modern salons.
✂ We are the fastest growing salon chain in Texas, owning **over 130** convenient locations.
✂ We have reasonable prices.
✂ We are a family-oriented business with emphasis on fashions and trends.

## Orientation

Your interview with **TGF** was your first contact with your assistant manager, manager or supervisor. At that time, you provided a completed application and demonstrated a technical haircut. It was based on this information that a decision was made to hire you. **TGF** prides itself on selecting top-notch professional stylists. Congratulations on becoming a part of a very professional and strong hair care team.

In order to provide the very best customer service and value in the hair care industry, **TGF** seeks employees like you who are professional, energetic, team-oriented, hard working, flexible, committed, sensitive to customer needs, open-minded, and systems-oriented. These characteristics help us ensure customer and employee satisfaction.

When you become an employee in a **TGF** salon, you will have some questions. The orientation process will provide an opportunity for those questions to be answered in the store and in the Technical Training Program Center. The actual orientation begins with completion of the W-4 form for tax purposes, the completion of the I-9 Employee Eligibility Verification form.

Following the paperwork, your manager will typically discuss the scheduling guidelines with you and the need for your flexibility. Scheduling can become very difficult, and the primary focus is on having enough staff available when customers are seeking services. Peak times are typically Saturdays, Sundays, lunchtime, and 3 to 8 p.m. on weekdays. Your manager will discuss the schedule with you, in addition to split shifts, call-ins, and other scheduling options used to reduce wait times to better serve customers. The scheduling process, combined with your flexibility, really mean more business for you and your store, and will allow you to make more money.

Also during the orientation, your manager will discuss the dress code and the importance of appearing professional at all times. Other information covered in the orientation will include: employee purchases, the duty roster, job description, break room, insurance information, and any other information that may be specific to your salon.

During the orientation in your store, please don't hesitate to ask your manager questions. This orientation process is designed to help you get off on the right foot. The orientation may continue in Technical Training, depending on the next scheduled session.