O

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CELIA JOHNSON, INDIVIDUALLY, | § | |
| AND ON BEHALF OF ALL OTHERS | § | |
| SIMILARLY SITUATED, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-3641 |
| | § | |
| TGF PRECISION HAIRCUTTERS, | § | |
| INC., BRELIAN, INC., and | § | |
| FRANK TAVAKOLI, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM AND ORDER

Pending is Defendants' Motion to Decertify Class (Document No. 304). After carefully considering the motion, response, reply, surreply, and the applicable law, the Court concludes that the motion should be granted.[1]

I. Background

Plaintiff Celia Johnson ("Johnson") brings this action against Defendants TGF Precision Haircutters, Inc., Brelian, Inc. ("Brelian"), and Frank Tavakoli ("Tavakoli") for violations of the

---

[1] Also pending is Defendants' Motion to Strike Plaintiff's Surreply Filed Out of Time (Document No. 330). The filing of Plaintiff's Surreply "out of time" was occasioned by the timing of Defendants' own Reply, and their Motion to Strike is therefore DENIED. Defendants' alternative request to file additional briefing is also DENIED, as the parties have had ample opportunity fully to brief the matter presently under review.

Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*[2] Johnson, who alleges that she was an "hourly employee" of TGF, contends that although she "regularly worked in excess of 40 hours a week," Defendants made her work "off the clock" and did not pay her "time and a half for all time worked over forty hours a week." Document No. 281 ¶¶ 2, 13.  She seeks unpaid backwages, liquidated damages, interest, costs, and attorney's fees.

Johnson also sues in behalf of "other employees similarly situated," thereby invoking the collective action provision of FLSA § 16(b), 29 U.S.C. § 216(b).  Applying the lenient standard recognized in Mooney v. Aramco Servs. Co., 54 F.3d 1207 (5th Cir. 1995), the Court on Johnson's motion conditionally certified a class "composed of all current and former TGF stylists and receptionists who worked for [TGF] between September 10, 2000, and the present." *See* Johnson v. TGF Precision Haircutters, Inc., 319 F. Supp. 2d 753, 756 (S.D. Tex. 2004).  Notices were sent to nearly 4,000 potential opt-in plaintiffs, and approximately 264 current and/or former employees filed written consents to join the instant action. *See* Document No. 304, at 4.  Defendants now move for class decertification, arguing that certain of these employees were not in fact qualified to opt-in--and that those who were qualified are not "similarly situated" within the meaning of § 216(b) such as to permit the trial of a collective action.

---

[2] Johnson refers to Defendants collectively as "TGF."

II. <u>Discussion</u>

At this stage the Court must make a factual determination based on information gained from discovery on whether the conditionally certified class members are in fact similarly situated. *See* <u>Mooney</u>, 54 F.3d at 1214. "If the [class members] are similarly situated, the district court allows the representative action to proceed to trial." <u>Id.</u>  If not, the district court decertifies the class, dismisses without prejudice the opt-in plaintiffs, and allows the class representative to proceed to trial on her individual claims. *See* <u>id.</u>

"During this 'second stage' analysis, a court reviews several factors, including '(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations. . . .'" <u>Thiessen v. Gen. Elec. Capital Corp.</u>, 267 F.3d 1095, 1103 (10th Cir. 2001) (quoting <u>Bayles v. American Med. Response of Colo., Inc.</u>, 950 F. Supp. 1053, 1066 (D. Colo. 1996)); *see* <u>Mooney</u>, 54 F.3d at 1215 (quoting district court's consideration of these factors).

Defendants argue for decertification on the grounds that: (1) Johnson and the opt-in Plaintiffs (collectively, "Plaintiffs") worked at 90 or more separate locations under separate management with varying policies and working conditions; (2) Plaintiffs' pay plans varied greatly in terms of hourly rates, commissions, and

3

various forms of supplemental pay; (3) some Plaintiffs worked only part time; (4) those Plaintiffs who were receptionists averaged less than 40 hours per week and those who were stylists worked essentially on commission under circumstances that exempted them from overtime pay requirements; (5) many Plaintiffs worked for such a brief period of time at TGF that their claims would be *de minimis*; and (6) that Defendants' highly individualized defenses to Plaintiffs' individual claims are numerous and varying. *See* Document No. 304, at 12-13.

A.   <u>Disparate Factual and Employment Settings</u>

Defendants' initial arguments relate to the first decertification factor--disparate factual and employment settings of the class members. *See* <u>Thiessen</u>, 267 F.3d at 1103; <u>Moody</u>, 54 F.3d at 1215; <u>Moss v. Crawford & Co.</u>, 201 F.R.D. 398, 409 (W.D. Pa. 2000) ("The first factor assesses the opt-in plaintiffs' job duties, geographic location, supervision, and salary.").

1.   <u>Job Duties</u>

The conditionally certified class encompasses both hair stylists and receptionists, with each group having quite different and distinct primary job duties while still sharing some common tasks. According to TGF's 2002-2003 Policies & Procedures Manual (the "Manual"), stylists were responsible for consulting with

4

customers and providing actual hair styling services, while receptionists were to welcome customers, place them with an available stylist, operate the cash register, prepare daily deposits, and answer the phone. *See* Document No. 320 ex. A ex. 2, at 34-48. Although managers are not explicitly encompassed within the conditionally certified class, it appears that some managers and assistant managers may have also worked as stylists during the period in question. *See, e.g.,* id. ex. B exs. 8-9. Managers had additional duties, such as hiring, scheduling, taking disciplinary actions (including termination), taking inventory, opening and closing the store, and holding weekly meetings with staff. *See* id. ex. A ex. 2, at 49-51. The overlapping tasks of all employees were to recommend TGF's Shiva product line, help keep the store clean, and complete their own timesheets. *See* id. at 37, 41, 52. The differences in job duties between stylists and receptionists, Plaintiff suggests, could be accommodated with two sub-classes of employees. Indeed, if it were not for the far more serious differences described below, the job duties per se might not require decertification.

2.  Geographic Location

Defendants emphasize that TGF conducted business at over 90 different locations. Johnson argues that because the locations are all in Texas, principally in the Houston, Austin, and San Antonio

metropolitan areas, the geographic variance is minor. *Cf.* <u>Lusardi
v. Xerox Corp.</u>, 122 F.R.D. 463, 465 (D.N.J. 1988) (reaffirming
decision to decertify class where, *inter alia*, a sample of
approximately 1,300 opt-in plaintiffs encompassed 17 different
Xerox groups in 34 cities or towns in 16 different states).
Variances even within a single state, however, are not necessarily
insignificant. *See*, *e.g.*, <u>Basco v. Wal-Mart Stores, Inc.</u>, No.
CIV.A. 00-3184, 2004 WL 1497709, at *7-8 (E.D. La. July 2, 2004)
(unpublished). The putative class members in <u>Basco</u> were Wal-Mart
employees who, like Plaintiffs, claimed that they were denied
overtime by being forced to work off the clock and miss or work
during meal and/or rest breaks. *See* <u>id.</u> at *2. In deciding not
to certify a statewide class of potential plaintiffs, the district
court observed: "A store locate[d] in Northern Louisiana faces
different pressures and sales dynamics than a store in Southern
Louisiana. Such variances would be equally possible within the New
Orleans area even from store to store." <u>Id.</u> at *8. That observa-
tion, however, was predicated upon the court's determination that
the corporate "policy" at issue in the case--one of keeping
employee wage costs low--was not uniformly or systematically
implemented at any given store. *See* <u>id.</u> at *7. Thus, the policy
did not "bind" the plaintiffs' claims together in a way that
promoted collective adjudication. *See* <u>id.</u> The evidence here is
that there was a substantial variance of experiences by different

6

Plaintiffs under different managers and at different shops around
Texas.  For example, at some stores some Plaintiffs state that they
were not allowed to clock-in for the 15 minutes before the store
opened and at other stores employees were permitted to clock-in for
that preparatory quarter-hour.  Some Plaintiffs say that at their
store they were required to clock-out when waiting for customers
and a few of those claim they were not permitted to leave the
store, but other Plaintiffs who filed declarations describe no such
experience.  Some Plaintiffs complain that they were required to
clock-out for breaks, but do not state if these were lunch breaks
or additional breaks beyond those allowed with compensation.  The
large number of widespread shops, each with its own manager,
understandably appears to have contributed materially to the
dissimilarities of Plaintiffs' experiences.

3.  <u>Common Policy and Supervision</u>

One core question in the overall analysis essentially is
whether Plaintiffs are all complaining of the same practice or
policy that gives rise to their claims.  Johnson contends that
there was "an overarching policy to deny Plaintiffs overtime
[pay]," which she contends was embodied in the Manual and "enforced
by Tavakoli's tight supervisory control."  Document No. 319, at

11.[3]  Johnson points out that the Manual instructs a stylist to arrive at his/her salon 15 minutes early so as to be "prepared to work at your scheduled time," and states that a stylist is expected to stay late  if necessary to complete work on a customer, even if it means staying past the stylist's scheduled departure time.  *See* Document No. 320 ex. A ex. 2, at 20.  The Manual does not say that a stylist is not to be paid for the preparatory time of 15 minutes before the shop opens or for completing work on a customer at the end of the day.  In fact, the Manual states that the stylist should note his/her departure time on his/her timesheet so that "*it accurately reflects the actual hours worked*." *See* id. (emphasis added).  Likewise, although Johnson cites to a "Receptionist and Front Desk Procedures Handout," this handout states that "[r]eceptionists are always *scheduled* 15 minutes prior to opening time or the first appointment." *See* id. ex. 6, at 2.  Johnson relies on the declarations of dozens of Plaintiffs who make generalized statements such as: "While employed by TGF, I was *frequently* required to, and *often* did, arrive to work early, and I was not paid for these times," (emphasis added), or "While employed

---

[3]  As explained above, Johnson's allegations about the existence of a "common policy violating the FLSA" permitted conditional class certification to begin with.  Now that discovery has been conducted, however, those allegations merit a more searching review.  *Cf*. Basco, 2004 WL 1497709, at *4-5 (considering both stages of the "similarly situated" inquiry simultaneously, because substantial discovery had already occurred); England v. New Century Fin. Corp., 370 F. Supp. 2d 504, 509 (M.D. La. 2005) (following Basco).

by TGF, I was *frequently* required to, and *often* did, work after my shift was over, and I was not paid for these times." (emphasis added.) *See generally* <u>id.</u> ex. B.[4] Johnson also cites declarations made by a handful of former TGF managers and/or supervisors. Some state that they required stylists and receptionists at their shop to arrive early, but did not clock them in until the salon opened-- or that they clocked the stylists and receptionists out once the store closed, even if the employees were still working--because Tavakoli and/or the Manual required them to do so. *See, e.g.*, <u>id.</u> ex. B exs. 17, 40.[5] The policy of other managers was to have stylists and receptionists clock-in for the 15 minutes before the

---

[4] Defendants argue that these declarations should have been (but were not) disclosed in response to their interrogatories and requests for production--and therefore should not be considered in deciding the Motion to Decertify. Johnson replies that nearly all the declarations were made *after* she had responded to the interrogatories and requests for production. In any event, Defendants have been able to respond to the declarations and they will be considered. Defendants' conclusory objections to the declarations as "riddled with hearsay and speculative statements" are DENIED.

[5] It is clear that Tavakoli was involved in TGF's overall operations. *See* Document No. 281 ¶ 6; No. 301 ¶ 6. For example, a former TGF manager and a former supervisor state that Tavakoli would sometimes call and/or visit their salons to check on sales and to ensure that employees were following company policy. *See* Document No. 320 ex. B exs. 7, 55. Tavakoli himself testified that he personally attended most managers' meetings, which occurred as frequently as biweekly and sometimes involved discussion of TGF's policies and procedures. *See* <u>id.</u> ex. A, at 40-45. Tavakoli was also usually involved in writing the handouts used at the meetings, which often contained information on promotions, proper salon operations, and effective management skills. *See, e.g.*, <u>id.</u> ex. A, at 42; exs. 8-11.

store opened and to stay clocked-in when working late. These managers state they received complaints from their employees about shortages in their paychecks, but do not state how they resolved those complaints. *See* id. exs. 42-43.

Johnson also points out that one part of the Manual states that employees should "clock out for **all** breaks." *See* id. ex. A ex. 2, at 53.[6]  A more specific section in the Manual, however, explains that while time is deducted for a half-hour lunch break, time is *not* deducted from an employee's hourly rate for 15 minute breaks. *See* id. at 43.[7]  Many of Plaintiffs' declarations upon which Johnson relies contain statements such as, "While employed by TGF, I was required to clock out when I took a break," without identifying the reason, nature or length of the break. *See, e.g.*, id. ex. B exs. 15, 22, 24, 29, 37, 45, 59.  While some declarants complain that they were required to clock-out for smoke breaks lasting less than 20 minutes, these declarants do not explain

---

[6]  Applicable regulations state that rest periods of a short duration, typically lasting five to 20 minutes, must be counted as hours worked, but a bona fide meal period of 30 minutes or more does not count as time worked.  *See* 29 C.F.R. §§ 785.18-.19.

[7]  According to the Manual, employees receive one fifteen minute break in a four to five hour shift, one fifteen minute break and one half-hour lunch in a six to eight hour shift, and two fifteen minute breaks and a half-hour lunch in shifts exceeding eight hours.  *See* Document No. 320 ex. A ex. 2, at 43.

whether the smoke breaks were taken as--or in addition to--normal rest breaks. *See*, *e.g.*, <u>id</u>. exs. 14, 25.[8]

Nevertheless, at least some Plaintiffs state that they were required to clock-out "while engaged in waiting activities, such as reading the newspaper, when no customers needed assistance," and a few of these Plaintiffs add that they were not permitted to leave the salon even though they were clocked out. *See, e.g.*, <u>id</u>. exs. 31-32, 35-36, 73-74.[9]  Another handful of Plaintiffs contend that their timesheets reflected deductions for breaks not taken. *See*, *e.g.*, <u>id</u>. exs. 3, 10, 23.  Several managers and/or supervisors have submitted declarations supporting these latter claims. *See, e.g.*, <u>id</u>. exs. 40, 55, 71.  One supervisor, for example, stated that Tavakoli told her to reduce the time worked on various timesheets by an hour if the timesheets did not reflect a lunch break, and Johnson has produced timesheets that appear to have been altered. *See* <u>id</u>. ex. A ex. 15, ex. B ex. 55.[10]  Indeed, while Tavakoli denied

---

[8] Some declarants also complain that they were required to clock-out when engaging in *personal* phone calls. *See, e.g.*, Document No. 320 ex. A exs. 20, 27-28.

[9] Applicable regulations require that, in certain circumstances, "waiting time" be counted as time worked. *See* 29 C.F.R. §§ 785.14-.17. Whether an employee is required to remain on the employer's premises, or so close to it that she cannot use the waiting time for her own purposes, is a relevant factor. *See* <u>id</u>. § 785.17.

[10] The timesheets contain language stating that "Absolutely No Overtime is approved Under any Circumstances." *See* Document No. 320 ex. A ex. 15.

requiring employees to clock-out for breaks, he admitted that if a timesheet reported eight or more hours worked in a day, TGF would deduct 30 minutes for lunch.  *See* <u>id.</u> ex. A, at 79-81.[11]

Finally, Johnson complains that employees were required to attend meetings and/or training classes for which they were not paid.[12]  With the exception of management, the Manual encourages-- but does not require--attendance at regular meetings.  *See* <u>id.</u> ex. A ex. 2, at 19, 49.  Although Tavakoli testified in his deposition that he thought stylists were paid for attending weekly meetings, approximately 54 of the 75 Plaintiffs who submitted declarations claim that they "often attended TGF meetings," and "[were] not paid for time spent at these meetings."  See <u>id.</u> ex. A, at 68-69; *see* generally <u>id.</u> ex. B.  A few former supervisors and/or managers acknowledge that, at the instruction of upper management (sometimes Tavakoli), they required stylists and receptionists to attend meetings for which they either were not paid or "may not have been

---

[11] Tavakoli explained, however, that he believed that if an employee was busy enough to work eight hours, the lost hourly pay would be offset by commissions.  *See* Document No. 320 ex. A, at 81; *infra* at 15-16 (explaining how stylists and receptionists were paid).

[12] Under applicable regulations, attendance at meetings, lectures, and training programs is not counted as time worked if *all* of the following conditions are met: (1) attendance is outside of the employee's regular working hours; (2) attendance is in fact voluntary; (3) the course, meeting, or lecture is not directly related to the employee's job; and (4) the employee does not perform any productive work during such attendance.  29 C.F.R. § 785.27.

paid." *See* id. exs. 62, 69, 71.  With respect to training, the Manual states that attendance at TGF's continuing education courses --which aspire to provide "an opportunity to stay current on the latest trends and skills necessary to excel in the hair care industry"--is mandatory for stylists interested in a management position.  Id. ex. 2, at 14.  Approximately 18 Plaintiffs stated that they attended these continuing education classes, but were not paid for doing so.  *See, e.g.*, id. ex. B exs. 16-17, 27-28.  Again, former supervisors and/or managers acknowledge requiring stylists to attend these classes, and Tavakoli conceded in his deposition that sometimes employees were not paid for attending the classes. *See* id. ex. A, at 72-73; ex. 2, at 52 (Manual states that employees are "neither paid nor charged for company educational classes") ex. B exs. 17, 69.

The foregoing conglomerate of diverse evidence indicates that some Plaintiffs may have prima facie claims for FLSA violations at different times, in different places, in different ways, and to differing degrees, but the evidence of varied particular violations is insufficient to show that Defendants implemented a uniform, systematically applied policy of wrongfully denying overtime pay to Plaintiffs.  On the one hand, some supervisors and/or managers attribute their actions to violate the FLSA to instructions from Tavakoli, which suggests the existence of an "overarching" policy. At the same time, however, the alleged violations are not uniform;

to the contrary, they are highly variable, evidently depending to a great extent upon circumstances and the attitudes and perceptions of individual managers at particular salons. The numerous variations of complaints alleged, and concomitant individual inquiries that would be required, all weigh in favor of decertification. *Cf.* England, 370 F. Supp. 2d at 511 ("[I]ndividual inquiries must predominate in this case because of the different locations, managers, and factual situations involved at each location."); Stone v. First Union Corp., 203 F.R.D. 532, 546 (S.D. Fla. 2001)(finding that personnel actions upon which plaintiffs based their complaint were "too diverse to support a collective action of 'similarly situated' individuals"); Bayles, 950 F. Supp. at 1061 ("[E]ach plaintiff's proof of violation will be individualized because it depends upon how or whether defendant's policy was implemented by individual managers with regard to individual plaintiffs. . . .").[13]

---

[13] Notably, in support of their motion Defendants have submitted dozens of surveys filled out by TGF managers who did not opt-in to the instant lawsuit. *See* Document No. 320 ex. 17. Most of those persons were employed by TGF during the notice period. Johnson has not objected to these surveys, which are generally signed and state that the answers given therein are true, correct, and made under penalty of perjury. Many of the surveys indicate that employees who arrive before opening or stay after closing do in fact record this time on their timesheets, that they do not clock-out to talk on the phone or take a smoke break, that they do take and clock-out for a thirty minute lunch, and that attendance at manager and training meetings is voluntary. *See generally* id. The individualized nature of the claims--from shop to shop and from manager to manager--is plain.

4.   <u>Salary</u>

The complexity of individualized claims alleged in this case is only exacerbated by the variety of methods by which Plaintiffs were paid.   Receptionists were generally paid at an hourly rate between $5.15 and $9, but some also received commissions on sales of Shiva products.   *See* Document No. 304, at 5.   Stylists were paid the greater of (1) a varying hourly rate, or (2) commissions consisting of the aggregate of 40% of styling service income, 20% of income on sales of Shiva products, and 10% on sales of other products.   *See* <u>id.</u>; Document No. 320 ex. A, at 88-89.   Managers and assistant managers were paid like stylists but could earn a higher commission on styling service income, and Managers had a "specific guarantee" as their fallback rather than an hourly rate.   *See* Document No. 304, at 5-6; exs. 7-10.   Furthermore, assistant managers would sometimes receive a weekly "supplement" to their pay. *See* <u>id.</u>  Other employees were likewise eligible for a weekly "key holder" supplement if they opened and closed the salon each day. *See* <u>id.</u> ex. 11.   These supplements, however, differed from individual to individual.  *See* <u>id.</u> exs. 11-12.  Further complicating the payment process is the fact that a stylist's pay fluctuated depending upon his or her particular experience, store volume, and performance.   *See* <u>id.</u> at 6-7; Document No. 320 ex. A ex. 17.

Johnson argues that these many variations do not necessarily favor decertification.   *See* <u>Bradford v. Bed Bath & Beyond</u>, 184 F.

15

Supp. 2d 1342, 1351 (N.D. Ga. 2002) (stating that differing annual salaries did not create an individual issue because "the compensation due to each Plaintiff can be calculated using a formula to figure the expected hourly rate for each employee based on his or her annual salary"); Moss, 201 F.R.D. at 410 (finding that variations in plaintiffs' duties, job locations, and hourly billing rates did not "differentiate the collective basis of the class to the extent that it defeats the primary objectives of a § 216(b) action").  Unlike Bradford and Moss, however, this case does not involve claimants all being paid hourly rates, with the rates being the only variable, but instead an overlay of a complex fluctuating commission system is present.  The latter also implicates an FLSA exemption, which is discussed below in considering individualized defenses.

Before considering the individualized defenses raised as to numerous Plaintiffs, however, it is quite evident that Plaintiffs' claims themselves are diverse and disparate, typically depending upon the perceptions and practices of individual shop managers at nearly 90 different locations in three major cities in Texas, with the claims being rendered all the more dissimilar by the fact that most of the stylists were compensated in a fluctuating commission system.

B. <u>Defenses</u>

The second inquiry on decertification is whether Defendants have defenses available that appear to be individual to various Plaintiffs. *See* <u>Thiessen</u>, 267 F.3d at 1103; <u>England</u>, 370 F. Supp. 2d at 509-10. Defendants raise the FLSA's § 7(i) exemption as to the vast majority of Plaintiffs and the *de minimis* rule as to about one-fourth of Plaintiffs.[14]

Section 7(i) of the FLSA states in relevant part:

> No employer shall be deemed to have violated [the overtime provisions] of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under the [minimum wage section]

---

[14] Defendants invocation of the *de minimis* rule is based on their contention that approximately 70 Plaintiffs worked for TGF for fewer than 13 weeks and that their claims should therefore be rejected under the *de minimis* rule. This appears to be a misunderstanding of the *de minimis* rule, which does not have bearing on the pending decertification motion. "The *de minimis* rule provides that an employer, in recording working time, may disregard 'insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes.'" <u>Mireles v. Frio Foods, Inc.</u>, 899 F.2d 1407, 1414 (5th Cir. 1990) (quoting 29 C.F.R. § 785.47). However, "[t]his rule applies only where there are uncertain and indefinite periods of time involved of a *few seconds or minutes duration*, and where the failure to count such time is due to considerations justified by industrial realities." 29 C.F.R. § 785.47 (emphasis added). Indeed, an employer "may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him." <u>Id.</u>

of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i).  It is uncontroverted that Defendants operate a "retail or service establishment" within the meaning of § 7(i) and are therefore entitled to assert this defense.  *See* 29 C.F.R. § 779.312 *et seq.*[15]  Johnson argues that this is simply a generalized, classwide defense, and therefore does not weigh against class certification.  *See* <u>Moss</u>, 201 F.R.D. at 410 (explaining that second factor asks "whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual opt-in plaintiff").  In one sense the § 7(i) exemption pertains to the opt-in class as a whole, because Defendants assert it broadly.  Functionally, however, § 7(i) is in fact a highly individualized defense because its application requires week-by-week and other periodic calculations (*e.g.*, not less than monthly on one part of the formula) specific to each individual Plaintiff and his or her particular circumstances.  The "regular rate" of pay, for example, "is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight time earnings for such hours

_____

[15] Johnson contends that Defendants failed to comply with certain record keeping requirements related to the § 7(i) exemption.  *See* 29 C.F.R. §§ 516.16, 779.420.  Even if so, such a failure would not make the § 7(i) exemption unavailable.  *See* <u>Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd.</u>, 246 F. Supp. 2d 886, 899-900 (S.D. Ohio 2003).

to obtain the statutory regular rate." 29 C.F.R. § 779.419; *see* Schwind v. EW & Assocs., Inc., 371 F. Supp. 2d 560, 567 (S.D.N.Y. 2005).[16]  With respect to commissions, § 7(i) also requires the totaling of each particular Plaintiff's commissions over a "representative period" of not less than one month. *See* 29 U.S.C. § 207(i).  This "representative period" is meant to be "a period which typifies the total characteristics of an employee's earning pattern in his current employment situation, with respect to the fluctuations of the proportion of his commission earnings to his total compensation." 29 C.F.R. § 779.417.  The proof required to establish these individualized § 7(i) exemption defenses would become the overwhelming focus of a trial which, to a jury or factfinder, would amount to trials of perhaps as many as 200 individual cases.[17]  Thus, the § 7(i) exemption defense weighs heavily in favor of decertification. *Cf.* Basco, 2004 WL 1497709, at *8 ("Wal-Mart's potential defenses to any alleged FLSA overtime violations will require highly individualized evidence concerning each associate."); Wynn v. National Broadcasting Co., Inc., 234 F. Supp. 2d 1067, 1085 (C.D. Cal. 2002) (declining to certify class

---

[16] The FLSA "takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks." 29 C.F.R. § 778.104.  Thus, "it is . . . necessary to determine the hours worked and the compensation earned by . . . commission employees on a weekly basis." Id.

[17] This burden becomes even greater with the individualized, fluctuating nature of Plaintiffs' payment plans described above.

where, *inter alia*, individualized issues, including individualized
defenses, would predominate); Morisky v. Public Serv. Elec. and Gas
Co., 111 F. Supp. 2d 493, 499 (D.N.J. 2000) (finding that an
exemption inquiry was "extremely individual and fact intensive," and
deciding that "the individual nature of the inquiry required make[s]
collective treatment improper in this case"); Brooks v. BellSouth
Telecomms., Inc., 164 F.R.D 561, 569 (N.D. Ala. 1995) (explaining
that circumstances of employment termination were diverse and that
"the court, if plaintiff's suggested class were certified, would be
faced with numerous individualized defenses").[18]

C.   Fairness and Procedural Considerations

In the decertification analysis the Court also must "consider
whether it can analyze the opt-in class with a 'broad scale
approach,'" keeping in mind the primary objectives of a collective
action under § 216(b): (1) to lower the costs to plaintiffs through
the pooling of resources; and (2) to limit the controversy to one

---

[18] Some cases have allowed a collective action to proceed in
spite of individualized defenses. *See, e.g.*, Thiessen, 267 F.3d
1107; Bradford, 184 F. Supp. 2d at 1351 . Unlike the instant case,
Thiessen involved pattern-or-practice discrimination claims such
that individualized defenses would not become a focal point until
the second stage of trial, and "could be dealt with in a series of
individual trials, if necessary." *See* Thiessen, 267 F.3d at 1107.
Bradford did involve an FLSA exemption, but not one like the § 7(i)
exemption, which here would require individualized proof and fact
findings as to each of the individual Plaintiffs against whom the
defense applies. *See* Bradford, 184 F. Supp. 2d at 1345-46, 1351.

proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity. *See Moss*, 201 F.R.D. at 410 (quoting <u>Lusardi v. Xerox Corp.</u>, 118 F.R.D. 351, 360 (D.N.J. 1987), *mandamus granted sub nom.* <u>Lusardi v. Lechner</u>, 855 F.2d 1062 (3d Cir. 1988)).  "The court must also determine whether it can coherently manage the class in a manner that will not prejudice any party." <u>Id.</u>

As Johnson points out, permitting this case to proceed as a collective action would allow for the pooling of resources by Plaintiffs in an effort to vindicate what may well be relatively small claims. *See* <u>Bradford</u>, 184 F. Supp. 2d at 1351.  This salutary benefit, however, must be weighed in the balance with all of the other factors, and those other factors on the whole weigh heavily for decertification.  As has been seen, Plaintiffs' claims are not based on a uniform, systematically applied practice that violates the FLSA, which, once rejected by the Court, would permit Plaintiffs' claims all to be quantified and duly compensated.  To the contrary, Plaintiffs' disparate and various claims do not present common issues of law and fact arising from the same alleged activity but depend upon varied and sundry activities of individual salon managers of different shops in about 90 different locations in three of Texas's largest urban areas.  TGF's Manual, which on the whole does not require implementation of a FLSA proscribed practice, and the overall directions given to the business by Tavakoli, were

perceived, understood, and applied in various ways by different
managers in different store locations, understandably resulting in
Plaintiffs having dissimilar claims.  Moreover, some of Plaintiffs
(it appears between 40 and 50) were receptionists (of which group
Plaintiff Johnson is not representative), although most Plaintiffs
were hair stylists whose principal task was cutting hair.  A wide
variety of compensation formulas applied to individual Plaintiffs
depending upon whether they were receptionists, hair stylists, key
holders, assistant managers, and the like.  On top of the wide
variety of circumstances surrounding Plaintiffs' claims, there is
an overlay of Defendants' § 7(i) defenses.  Defendants contend, with
support in summaries of their payroll records, that the vast
majority of the 264 opt-ins received more than one-half of their
compensation on commissions and that more than one-half of all opt-
ins earned in excess of one and one-half times the minimum hourly
rate for all hours worked.  These highly individualized defenses as
to the great majority of all opt-ins, with the layers of fact
findings required by § 7(i) as to each of those Plaintiffs, present
a case where the individualized claims and individualized defenses,
all of which are highly fact intensive, would not only dominate but
would swallow and consume the entire case.  *Cf.* <u>Basco</u>, 2004 WL
1497709, at *8 ("[A] collective action of this nature presents
enormous manageability problems because there is no single decision,
policy, or plan at issue."); <u>Mielke v. Laidlaw Transit, Inc.</u>, 313

F. Supp. 2d 759, 764 (N.D. Ill. 2004) (declining to certify collective action given the absence of a uniform policy, disparate factual and employment settings, and likelihood that case would not be resolved summarily); Wynn, 234 F. Supp. 2d at 1085 (quoting Thiessen, 267 F.3d at 1103) (Ultimately, "given the circumstances of this case, it would be nearly impossible for [it] to be 'coherently managed and evidence presented in a manner that would not confuse the jury or unduly prejudice any party.'"). Fairness and procedural considerations weigh persuasively in favor of decertification.

After having weighed (1) the disparate factual and employment settings of the opt-in Plaintiffs, and the absence of a uniform, systematically applied policy violating the FLSA; (2) the highly individualized nature of Defendants' § 7(i) exemption defenses; and (3) fairness and procedural considerations, the Court finds that Plaintiffs are not "similarly situated" within the meaning of the FLSA such as to make a collective action feasible, and Defendants' Motion to Decertify will be granted.

III. Order

For the foregoing reasons, it is hereby

ORDERED that Defendants' Motion to Decertify Class (Document No. 304) is GRANTED, and all opt-in Plaintiffs are DISMISSED from this action without prejudice to each such opt-in Plaintiff filing

a suit in his or her own behalf.   To avoid prejudice to individual opt-in Plaintiffs who may choose to file their own cases, the Court invokes its equity powers to toll the applicable statutes of limitations for 30 days after the entry of this Order.   The claims of Plaintiff Celia Johnson remain pending herein for trial.

The Clerk shall notify all parties and provide them with a signed copy of this Order.

SIGNED at Houston, Texas, on this 17th day of August, 2005.


EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

24